No. 23-706

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

IN RE: SANTA FE NATURAL TOBACCO
COMPANY MARKETING & SALES
PRACTICES AND PRODUCTS LIABILITY
LITIGATION

---

On Petition for Permission to Appeal from the United States
District Court for the District of New Mexico
No. MD 16-2695 JB/LF
The Honorable James O. Browning

---

## PLAINTIFFS-RESPONDENTS' RESPONSE TO DEFENDANTS' RULE
## 23(f) PETITION FOR PERMISSION TO APPEAL

---

NANCY R. LONG
JONAS M. NAHOUM
**Long, Komer & Associates, P.A.**
P.O. Box 5098
Santa Fe, NM 87502-5098
Phone: (505) 982-8405
Email: nancy@longkomer.com
Email: jonas@longkomer.com

MELISSA S. WEINER
**Pearson Warshaw, LLP**
328 Barry Avenue S., Suite 200
Wayzata, MN 55391
Phone: (612) 389-0600
Email: mweiner@pwfirm.com

SCOTT P. SCHLESINGER
**Schlesinger Law Offices, P.A**.
1212 SE Third Ave.
Ft. Lauderdale, FL 33316
Phone: (954) 467-8800
Email: scott@schlesingerlaw.com

*Counsel for Plaintiffs-Respondents*

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

INTRODUCTION..................................................................................................1

FACTUAL BACKGROUND ................................................................................2

ARGUMENT .......................................................................................................11

    I.    THE CLASS MEMBERS CAN BE PROPERLY IDENTIFIED
          SUCH THAT NO INDIVIDUALIZED INQUIRY DEFEATS
          PREDOMINANCE...............................................................................11

    II.   PLAINTIFFS' DAMAGES METHODOLOGY FITS THEIR
          MENTHOL THEORY OF LIABILITY ............................................13

CONCLUSION ....................................................................................................21

CERTIFICATE OF SERVICE............................................................................21

CERTIFCATE OF WORD COUNT....................................................................213

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Benson v. Newell Brands, Inc.*,
  No. 19 C 6836, 2021 WL 5321510 (N.D. Ill. Nov. 16, 2021) ...............................20

*Broomfield v. Craft Brew Alliance, Inc.*,
  No. 17-cv-01027-BLF, 2018 WL 4952519 (N.D. Cal. Sept. 25, 2018)..........................16, 17

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ......................................................................................9

*In re Dial Complete Mktg. & Sales Pracs. Litig.*,
  320 F.R.D. 326 (D.N.H. 2017) .................................................................17

*Fitzhenry-Russell v. Pepper Snapple Grp. Inc.*,
  326 F.R.D. 592 (N.D. Cal. 2018) ......................................................15, 16

*Hilsley v. Ocean Spray Cranberries, Inc.*,
  No. 17cv2335-GPC, 2018 WL 6300479 (S.D. Cal. Nov. 29, 2018)...............................16, 17

*McMorrow v. Mondelēz Int'l, Inc.*,
  No. 17-cv-2327-BAS, 2021 WL 859137 (S.D. Cal. Mar. 8, 2021) ........................................16

*Price v. L'Oreal USA, Inc.*,
  No. 17 Civ. 614 (LGS), 2018 WL 3869896 (S.D.N.Y. Aug. 15, 2018).................................17

*In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. & Prods. Liab. Litig.*,
  288 F. Supp. 3d 1087 (D.N.M. 2017).............................................................*passim*

*In re Takata Airbag Prod. Liab. Litig.*,
  --F. Supp. 3d --, No. 15-MD-02599-FAM, 2023 WL 4925368 (S.D. Fla. June 20, 2023)..............................................................................................20

*Townsend v. Monster Beverage Corp.*,
  303 F. Supp. 3d 1010 (C.D. Cal. 2018).........................................................17

*U.S. v. Hunt*,
  513 F.2d 129 (10th Cir. 1975) ...................................................................13

**Other Authorities**

Federal Rule of Civil Procedure 23 .......................................................11, 12, 13

Federal Rule of Civil Procedure 23(b)(3)(D) ...........................................11, 12

Federal Rule of Civil Procedure 23(f) .............................................................. 10, 11, 13, 18

Federal Rule of Civil Procedure 52 ................................................................................ 13

Federal Rule of Civil Procedure 52(1)(6) ...................................................................... 13

Federal Rule of Civil Procedure 52(a)(3) ...................................................................... 13

## **INTRODUCTION**

Seeking to capitalize on an increasing demand for healthier products, Defendants utilize health descriptors of "natural," "additive-free," and "organic" to market their Natural American Spirit cigarettes ("NAS cigarettes"). Indeed, Defendants have long known that consumers' health benefit perception is what drives purchases of NAS cigarettes and smokers' willingness to pay a premium for an allegedly safer cigarette.

Defendants urge this Court to manufacture procedural hurdles by asking that an administrative feasibility requirement be read into Rule 23. To the contrary, the plain language of Rule 23's text does not require a heightened proof of administrative feasibility at the certification stage. Imposing such a requirement would preclude vast swaths of consumer cases that are perfectly suited for class treatment. None of Defendants' arguments withstand scrutiny, and they present no reason to depart from the ordinary standard of Rule 23.

Furthermore, Defendants' attempts to recast Plaintiffs' liability theory as a basis to argue the district court misapplied the requirements of *Comcast v. Behrend* is without merit. In analyzing Plaintiffs' theory of liability and their proposed damages model, the district court properly applied the requirements of *Comcast v. Behrend* and did not err in finding Plaintiffs' damages model that calculates class-wide damages resulting from the "100% additive-free" representation—without

needing to consider other *potential* subjective interpretations that class members *may* have of this representation—fits a legal theory of liability premised on the reasonable consumer standard.

Defendants consistently focus on their desired merits outcomes rather than the crux of the Rule 23 issues. The district court accurately surveyed Defendants' uniform course of conduct alongside the voluminous universe of evidence informing the legality of that conduct to conclude that Plaintiffs' damages model fits their legal theory of liability premised on the reasonable consumer standard. If the Court is inclined to grant 23(f) relief, it should grant Plaintiffs' petition for relief.

## **<u>FACTUAL BACKGROUND</u>**

Following full briefing on Plaintiffs' motion for class certification, motions to exclude various expert reports, and a five-day evidentiary hearing, the district court made findings of fact that overwhelmingly adopted Plaintiffs' central allegations: that Defendant Tobacco Companies, Santa Fe Natural Tobacco Company and R.J Reynolds ("Defendants"), misled reasonable consumers through uniform, calculated deceptive labeling and advertising of their NAS cigarettes by using the health descriptors "natural," "additive-free," and "organic"; that NAS cigarette purchasers pay a premium compared to other cigarettes; and that the FDA concluded that the purported safety disclaimer does not offset health misperceptions. (*See*

Memorandum Opinion and Order on Class Certification, ("Order"), ECF No. 394.)
The district court also denied Defendants' challenges to Plaintiffs' experts. (*Id*.)

NAS cigarette founders believed that an additive-free cigarette would prove less harmful than the brands produced by large tobacco manufacturers, which contained added chemicals. (Order at ¶ 31 (citing Plaintiffs' Requested Findings of Fact, ("Pls.' FOF"), ECF No. 361, ¶ 71).) By the late 1990s, the tobacco industry took notice of NAS cigarettes' health-based appeal. (*Id*. at ¶¶ 66, 133.) Through strategic brand positioning, NAS cigarettes use the descriptors "natural, "organic" and "additive-free." (*Id*. at ¶¶ 29, 30, 31, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 52, 53, 54, 55, 56, 5, 58, 59, 60, 66 (noting the "imagery thus implies that [NAS] cigarettes have a reduced risk of harm.").) Seeking to capitalize on an "increasing demand for healthier products[,]" NAS used these tactics and descriptors as "'key points of differentiation' that 'drove trial and sales of the product at a premium price.'" (Order at ¶¶ 47, 48, 49, 50, 51, 61, 62, 70-75).) Importantly, Plaintiffs' expert, Dr. Michael Cummings, who Defendants did not challenge, opined, and the district court adopted, that consumers viewing these advertisements felt NAS cigarettes were "'safer,' 'healthier,' 'free of chemicals,' 'pure,' and 'clean[;]'" (*Id*. at ¶ 63; *see also* ¶ 67), which fall under the umbrella of a safer cigarette.  While overall cigarette consumption in the United States is declining, NAS cigarette sales have been increasing. (*Id*. at ¶ 122.)

Defendants knew that consumers thought their NAS cigarettes were safer. (*Id*. at ¶ 64, 66-72, 76, 77, 78, 83, 84-87, 162, 163, 164, 165, 166, 167.) This is true despite the disclaimer used on NAS cigarette packaging – "No additives in our tobacco does NOT mean a safer cigarette. (*Id*. at ¶ 81.) The district court recognized "[t]he disclaimer is limited to additives and "'says nothing about the natural or organic descriptors.'" (*Id*. at ¶ 82.) In 2015, the FDA published a study, titled Additive-Free and Natural Descriptors and Disclaimer Influence on Smokers' Perceptions of Natural American Spirit Cigarettes, filed July 23, 2020, ("FDA NAS Study"), which concluded that a disclaimer, that "No additives in our tobacco does NOT mean a safer cigarette," did not offset the effect of "100% Additive-Free Natural Tobacco" and "natural" descriptors on consumers' opinions, and that tested Natural American cigarette products conveyed "modified risk to consumers." (*Id*. at ¶ 88 (citing ECF No. 280-4; Pls.' FOF at ¶¶ 37, 255); *see also* Order at ¶¶ 184-86.) Thus, Defendants' disclaimer did not offset Defendants' health reassurances. (*See* Order at ¶¶ 143-53.) Said differently, consumers' health benefit perception is what drives purchasers of NAS cigarettes' willingness to pay a premium. (*See id*. at ¶¶ 136-56.)

Plaintiffs moved for class certification under two theories: (1) that NAS cigarettes' uniform labeling claims implied they are safer than others (the "Safer-Cigarette Theory") and (2) Defendants' "100% additive-free" claim as applied to

menthol cigarettes is literally false because menthol is an additive (the "Menthol Theory"). (*See id*. at ¶ 102.) Plaintiffs proposed a conjoint survey and marketplace simulation to calculate class-wide damages caused by Defendants' false and misleading labeling. (*See id*. at ¶ 224.)

For Plaintiffs' Safer-Cigarette Theory, Plaintiffs presented common evidence, that the district court adopted, that a reasonable consumer would interpret Defendants' advertising descriptors to mean the NAS cigarettes are safer despite the disclaimer. (*Id*. at ¶¶ 116-21, 130-33, 136-56.) For example, in the mid-1990s, between 89% and 100% of surveyed Natural American Spirit consumers indicated that the "absence of additives" was the "primary" reason for trying the brand. (*Id*. at ¶¶ 127.) "[T]he 'vast majority' of consumers who usually smoke Natural American Spirit Cigarettes claim to choose the brand because it is "100% No Additives" or "All Natural." (*Id*. at ¶ 129.) Natural, additive-free, and organic labeling increases consumers' health benefit perception and drives both purchases of NAS cigarettes and consumers' willingness to pay a premium. (Order at ¶ 130.) 39% of Natural American Spirit smokers rank additive-free as the reason for their purpose, and 74% of buyers stating that additive-free, natural, and organic descriptors were the main reason for their first purchase. (*Id*. at ¶ 136.) Natural American Spirit smokers are 22 times more likely than smokers of other brands to believe that their brand of cigarettes may be less harmful than others. (*Id*.)

Defendants' expert Dr. Kent Van Liere designed a survey to be purposefully ignorant of the issues in this case. Unlike every other scholarly work considering NAS cigarette descriptors, Dr. Van Liere did not show survey respondents the packaging or advertisements. (*See* Pls.' FOF at ¶ 220 (citing Deposition Transcript of Dr. Kent Van Liere, ("Van Liere Dep."), ECF No. 279-19, at 1236:3-17).) Nor did Dr. Van Liere seek to determine whether NAS cigarette descriptors implied health—if a respondent did not use the specific word "healthier," then his survey excluded them from the "healthy/healthier" category. (*See* Pls.' FOF at ¶ 225 (citing Van Liere Dep. at 1347).) If Dr. Van Liere added up the responses that imply health (such as "natural," "additive-free," and "organic"), then his survey actually shows 44% of respondents believe NAS cigarettes are "better for you" than other cigarettes. (*See* Pls.' FOF at ¶ 226 (citing Van Liere Dep. at 1352).)

For Plaintiffs' Menthol Theory, Plaintiffs presented common evidence that Defendants' uniform "additive-free" representations are literally false. (Order at ¶ 80 (citing *In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. & Prods. Liab. Litig.*, 288 F. Supp. 3d 1087, 1241 (D.N.M. 2017).) The majority of mentholated NAS cigarette smokers chose the brand because of its 100% no additives and all-natural claims. (*Id*. at ¶ 132; *see also* Plaintiffs' Reply Memorandum in Support of Class Certification, ("Cert. Reply"), ECF No. 331, at 35.) Defendants even know consumers are misled and do not know what menthol is. (*See* Order at ¶ 104 (citing

Defendant's Memorandum in Opposition to Class Certification, ("Cert. Opp."), ECF No. 315, at 42); *see also* Pls.' FOF at ¶ 314 (citing SF_MDL00034642, ECF No. 281-32, at 4645).) Thus, they cannot reasonably be expected to know that it is an additive when the labeling of NAS cigarettes plainly provides that they are "100% additive-free." (*See* Order on Motion to Dismiss, ("MTD Order"), ECF No. 146, at ¶ 173 ("Natural American's additive-free descriptor on menthol cigarettes also misleads a reasonable consumer. . .. Menthol's properties are not commonly known, even among cigarette users.").)

The district court previously found, "Menthol is an additive. Therefore, an additive-free cigarette cannot have menthol ... The Court concludes that this eventual commingling makes the menthol modifier inherently misleading." *In re Santa Fe Nat. Tobacco Co.*, 288 F. Supp. 3d at 1241. Further, Defendants' expert toxicologist on the subject, Dr. Charles Garner (an RJR employee), admitted as much. When asked to define a cigarette, Dr. Garner replied: "A cigarette is tobacco wrapped in paper that is intended to be smoked by a consumer." (Pls.' FOF at ¶ 307 (citing Deposition Transcript of Dr. Charles Garner, ("Garner Dep."), ECF No. 287-9, at 50:23-51:7.) He then agreed that "anything added to the cigarette is an additive." (*Id.* at 51:4-7.) Because menthol is added to the cigarette, menthol must be an additive— making Defendants' claims literally false.

Defendants place menthol in the cigarette filters, and because menthol is highly volatile, it migrates into the tobacco in the cigarette rod. (Pls.' FOF at ¶ 309 (citing Expert Report of K. Michael Cummings, ("Cummings Report"), ECF No. 280-6, at 16-18).) Indeed, the FDA concludes that "menthol diffuses throughout the cigarette irrespective of where it was applied." (Pls.' FOF at ¶ 310 (citing TPSAC Report, EFC No. 287-10).) Defendants' corporate representative confirmed that Defendants add menthol to the filter fully realizing that it will volatilize to the tobacco, making their "additive-free" tobacco claims literally false. (Pls.' FOF at ¶ 311 (citing Deposition Transcript of Kenneth DeLoach, ("DeLoach Dep."), EFC No. 287-11, at 122:19-25; 123:12-124:5) (Defendants' corporate designee on the issue of menthol engineering testified that "not all of the menthol would still be in the filter" by the time NAS cigarettes are sold at retail); Deposition Transcript of Michael A. Little, ("Little Dep."), ECF No. 287-12, at 37:14-20) (Defendants' former president testified that "it's my understanding that menthol does migrate" into the tobacco rod); Deposition Transcript of David DePalma, ("DePalma Dep."), ECF No. 280-14, at 21:5-16 (Defendants' former senior director of marketing testified that "migration happens over a period of time" even though Defendants do not add or spray menthol directly onto the tobacco).) Ignoring the falsity of Defendants' "100% additive-free" representations, and contrary to the evidence presented by Plaintiffs, the district court rejected Defendants' assertion that additive-

free could stand for a belief that menthol is not an additive and that the cigarettes are free of other, non-menthol additives. (Order at ¶ 137.)

Through expert testimony, Plaintiffs proposed using a conjoint analysis to calculate class members' economic damages by measuring both the price premium associated with Defendants' misleading representations (including "natural," "100% additive-free") and consumers' willingness to pay for the perceived benefits associated with those representations. (*See* generally Pls.' FOF at ¶¶ 27-29 (citing Expert Report and Opinions of Dr. Jean-Pierre Dubé, ("Dubé Report"), ECF No. 280-8; Expert Response of Dr. Jean-Pierre Dubé, ("Dubé Response"), ECF No. 287-40.) Defendants challenged Dr. Dubé's damages model under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), but the district court concluded Dr. Dubé's damages model was an adequate fit for Plaintiffs' Menthol Theory (not for Plaintiffs' Safer-Cigarette Theory, which is subject to Plaintiffs' 23(f) Petition) to the extent that consumers believed that NAS menthol cigarettes did not contain additives based on the 100% additive-free assertion. (Order at ¶ 137.)

This case is different than a typical false advertising class action. Defendants know their customers. For example, Defendants maintain a meticulous database of their customers, such that by May 2018, their active mailing list had thirteen million addresses. (*Id.* at ¶ 123; *see also* Pls.' FOF at ¶¶ 10, 154 (citing SF_MDL00714547,

ECF No. 280-11).) Class representatives like Joshua Horne,[1] Rudolph Miller,[2] Sarah Benson,[3] Abigail Emmons,[4] Charlene Blevins,[5] Clive Pontusson,[6] and Robert Litwin[7] all received emails or other mailers from Defendants for coupons or other consumer marketing material for NAS cigarettes. Robert Litwin[8] and Rudolph Miller[9] even corresponded with Defendants about their NAS cigarette purchases. Sarah Benson[10] and Charlene Blevins[11] testified about receipts they saved (and produced at deposition).

Defendants' petition states that the "district court recognized that no records identify these purchasers…." (Defendants' Rule 23(f) Petition for Permission to Appeal, "Defs.' Pet.," at 1.) That is critically incorrect. The district court's finding

---

[1] Deposition Transcript of Joshua Horne, ("Horne Dep."), ECF No. 287-23, at 38:2-39:9, 40:14-20.

[2] Deposition Transcript of Rudolph Miller, ("Miller Dep."), ECF No. 287-21, at. 98:12-99:3.

[3] Deposition Transcript of Sarah Benson, ("Benson Dep."), ECF No. 287-21, at 106:13-1-7:24.

[4] Deposition Transcript of Abigail Emmons, ("Emmons Dep."), ECF No. 287-15, at 62:1-8.

[5] Deposition Transcript of Charlene Blevins, ("Blevins Dep."), ECF No. 287-24, at 16:22-17:7, 80:2-7.

[6] Deposition Transcript of Clive Pontusson, ("Pontusson Dep."), ECF No. 287-18, at 36:17-21; 235:15-24.

[7] Deposition Transcript of Robert Litwin, ("Litwin Dep."), ECF No. 287-14, at 292:20-293:17.

[8] Litwin Dep. at 204:11-205:4.

[9] Miller Dep. at 77:4-7.

[10] Benson Dep. at. 18:22-25; 37:20-38:1.

[11] Blevins Dep. at 9:23-10-8.

that class representatives did not produce receipts is clear error. And Defendants' customer database with over 13 million people disproves its contention that there are no records or databases of purchasers. (Defs.' Pet. at 7.)

## ARGUMENT

## I.    THE CLASS MEMBERS CAN BE PROPERLY IDENTIFIED SUCH THAT NO INDIVIDUALIZED INQUIRY DEFEATS PREDOMINANCE

For reasons related to those set forth in Plaintiffs' Rule 23(f) petition, Defendants' Rule 23(f) petition agrees that interlocutory review is warranted to address the district court's rulings regarding ascertainability and administrative feasibility. *See* Defs.' Pet. at 1-2, 7-9, 11, 12-19. Defendants, like Plaintiffs, agree that this circuit, unlike most circuits, has not squarely addressed the key questions of: (i) whether Rule 23 imposes a free-standing requirement for a plaintiff to show *administrative feasibility* in order to certify a class, and, relatedly, (ii) whether, in the absence of such a free-standing requirement, under Rule 23(b)(3)(D)'s "managing" prong, plaintiffs are nevertheless required to show, as part of a *predominance* inquiry, the *administrative feasibility* to identifying class members. *See, e.g.*, Defs.' Pet at 12-13 ("The decision below raises a significant and recurring question of law presently unresolved in this Circuit: how does the fundamental task of identifying class members… factor into the Rule 23 analysis? There is widespread division among the other courts of appeals… this Circuit's district courts have split

over the issue."), 14 ("Some courts treat Rule 23 as containing 'an implicit requirement that class members be ascertainable' through 'administratively feasible methods.'"), 15-16 ("[S]ome Circuits have suggested that individualized inquiries into class membership cannot independently foreclose certification"; citing *Cherry v. Dometic Corp.*, 986 F.3d 1296 (11th Cir. 2021), and its reliance on Rule 23(b)(3)(D)'s "managing" prong), 16 n.6 (acknowledging that the Fifth and Eighth Circuits have declined to impose an administrative-feasibility requirement).

Defendants (and the Third Circuit) are wrong to read an administrative feasibility requirement into Rule 23. Especially because of consumer cases, such as the one here, Rule 23's text—including its text regarding "questions affecting only individual members"—does not require proof of administrative feasibility at the certification stage. *Cf.* Defs.' Pet. at 17. Imposing such a requirement would preclude vast swaths of consumer cases that are perfectly suited for class treatment.

Similarly, Defendants are wrong to argue, in the alternative, that administrative feasibility must be shown as part of the predominance inquiry under Rule 23(b)(3)(D)'s "managing" prong, including to ostensibly protect a defendant's "substantive right." Defs.' Pet. at 18-19. Especially when a defendant could proceed to trial and will not pay class members any more than the total damages proved at trial, Defendants' alternate argument is erroneous.

Although Defendants' arguments about ascertainability and administrative feasibility are incorrect, Plaintiffs agree that granting interlocutory review of the district court's order is warranted to allow this Court to shed light on those issues. *See,* Plaintiffs' Rule 23(f) Petition (pages 16-18) (providing a list of reasons supporting appellate review).

## II.    PLAINTIFFS' DAMAGES METHODOLOGY FITS THEIR MENTHOL THEORY OF LIABILITY

The district court did not err in finding Plaintiffs' damages model fits their Menthol Theory of liability. The labels on NAS menthol cigarettes falsely state that they contain "100% additive-free" tobacco. The district court concluded in its findings of fact that the tobacco in NAS menthol cigarettes contains the additive menthol.[12] Defendants add menthol to the filter, knowing that, by the time a consumer buys a pack, the menthol will migrate from the filter to the tobacco rod, which is then lit and consumed. *See* Plaintiffs' Motion for Class Certification, ("Cert. Mot."), ECF No. 278, at 35-36 (discussing testimony of Defendants' expert toxicologist, testimony of several of Defendants' officers and representatives, the expert report of Dr. Michael Cummings, and FDA reports concluding, "menthol

---

[12] Rule 52 of the Federal Rules of Civil Procedure allows a court to state findings of fact when ruling on a Rule 23 motion for class certification. *See* Rule 52(a)(3). Where a court has done so, findings of fact must not be set aside <u>unless clearly erroneous</u>. Fed. R. Civ. P. 52(1)(6); *U.S. v. Hunt*, 513 F.2d 129, 136 (10th Cir. 1975).

diffuses throughout the cigarette irrespective of where it was applied."). Defendants were not only aware that menthol migrates to the tobacco but made certain that the menthol would migrate before shipping to retailers.[13]

Accordingly, the district court properly concluded that "Natural American's additive-free descriptor on menthol cigarettes also misleads a reasonable consumer." *In re Santa Fe Nat. Tobacco Co.*, 288 F. Supp. 3d at 1227-30 The district court understood the simplicity of Plaintiffs' menthol theory:

> [A]dditive-free's meaning exists in direct conflict with the menthol's presence in the cigarette. Menthol is an additive. Therefore an additive-free cigarette cannot have menthol. It is not possible for some other cigarette manufacturer to produce a menthol cigarette that is additive free and truthfully advertise it as such . . .. Defendants admit . . . that, when the cigarette is smoked, inevitably the menthol intermingles with the tobacco. The Court concludes that this eventual commingling makes the menthol modifier inherently misleading.

*Id*. at 1241 (internal citations omitted). Using the proper foundation, with respect to Plaintiffs' Menthol Theory, the district court properly recognized that Plaintiffs' theory of liability is that "Defendants warranted that the Menthol NAS Cigarettes were additive-free." Order at ¶ 137. With respect to this theory, all of Plaintiffs'

---

[13] *See* DeLoach Dep. at 122:19-25; 123:12-124:5 (Defendant's designee on menthol engineering testified "not all of the menthol would still be in the filter" by the time NAS Cigarettes are sold at retail); Little Dep. at 37:14-20 (Defendant's former president testified "it's my understanding that menthol does migrate" into the tobacco rod); DePalma Dep. at 21:5-16 (Santa Fe's former senior director of marketing testified that "migration happens over a period of time" even though Defendants do not add or spray menthol directly onto the tobacco).

claims under the various state consumer protection statutes are subject to a reasonable consumer standard. *In re Santa Fe Nat. Tobacco Co.*, 288 F. Supp. 3d at 1227-30 (citing cases). Under this standard, "[s]pecific language communicates a specific meaning and a reasonable consumer interprets it with that specific meaning." *Id*. at 1234. The standard is objective. If a factfinder determines that this representation (that the product contains "100% additive-free" tobacco) is deceptive because it misleads reasonable consumers to believe it has a specific meaning (that the tobacco is, in fact, additive-free), this representation, as a matter of law, is deemed material to all class members. In turn, class members are deemed to have relied on the representation and harmed by the representation in the same way, regardless of individual class members' potential subjective interpretations of the representation. *See, e.g.*, *Fitzhenry-Russell v. Pepper Snapple Grp. Inc*., 326 F.R.D. 592, 612-15 (N.D. Cal. 2018) (consumer protection statues "'allow[] plaintiffs to establish materiality and reliance (i.e., causation and injury) by showing that a reasonable person would have considered the defendant's representation material'" and "[t]he standard 'does not require that class members have a uniform understanding of the meaning of' the challenged representation.") (quoting *In re ConAgra Foods, Inc*., 90 F. Supp. 3d 919, 983 (C.D. Cal. 2015) and *Pettit v. Proctor & Gamble Co.*, No. 15-cv-02150-RS, 2017 WL 3310692, at *3 (N.D. Cal. Aug. 3, 2017)).

To that end, Plaintiffs demonstrated that a reasonable consumer would interpret the "100% additive-free" tobacco representation to mean that the tobacco in the NAS menthol cigarettes is additive free. *See* Cert. Mot. at 37 (citing the expert report of Dr. Cummings and Defendants' internal documents). It thus follows that a damages model that calculates class-wide damages resulting from the "100% additive-free" representation—without needing to consider other *potential* subjective interpretations that class members *may* have of this representation—fits a legal theory of liability premised on the reasonable consumer standard. Order at ¶ 137; *accord, Fitzhenry-Russell*, 326 F.R.D. at 615 (conjoint analysis that does not consider differing interpretations that consumers may have of "Made From Real Ginger" representation on ginger ale products that contain only a "microscopic amount of ginger root" fits the reasonable consumer theory of the case); *McMorrow v. Mondelēz Int'l, Inc*., No. 17-cv-2327-BAS, 2021 WL 859137, at *15 (S.D. Cal. Mar. 8, 2021) ("Plaintiffs' damages model need not isolate and test the various possible interpretations of the term 'nutritious.'"); *Hilsley v. Ocean Spray Cranberries, Inc*., No. 17cv2335-GPC, 2018 WL 6300479, at *13-15 (S.D. Cal. Nov. 29, 2018) (where food products were allegedly falsely labeled as containing "no . . . artificial flavors," conjoint damages analysis properly calculated the price premium by looking at what the "mislabeled Products would have been worth if they had been labeled correctly"); *Broomfield v. Craft Brew Alliance, Inc*., No. 17-cv-

01027-BLF, 2018 WL 4952519, at *14-16 (N.D. Cal. Sept. 25, 2018) (where beer label allegedly misleads consumers to believe that it was brewed in Hawaii, "the question of individual consumer preferences and beliefs is irrelevant to the questions of materiality and reliance under California consumer laws. Likewise, it is irrelevant to the damages model here—the consumer need not have actually relied on the misrepresentation. Instead, [the expert's] model tests the difference between the price paid for a Kona Beer believed to be brewed in Hawaii and the value received given that the beer is actually brewed on the mainland. This allows [the expert] to test how much 'the price for the beer would have gone down if all consumers had known the beer is not brewed in Hawaii at the time of purchase.'") (internal and external citations omitted); *In re Dial Complete Mktg. & Sales Pracs. Litig.*, 320 F.R.D. 326, 333 (D.N.H. 2017) (permitting conjoint analysis where the plaintiffs' theory of liability was that the plaintiffs "were damaged . . . because they paid a price premium attributable to the falsely claimed product features") (citation omitted).[14]

---

[14] Defendants' attempt to undermine the district court's application of *Hilsley*, *supra*; *Broomfield*, supra; *In re Dial Complete, supra*; and *Price v. L'Oreal USA, Inc.*, No. 17 Civ. 614 (LGS), 2018 WL 3869896 (S.D.N.Y. Aug. 15, 2018), are unavailing. The district court expressly considered all these cases and correctly found that they supported its finding that Plaintiffs' damages model "is an adequate fit for their Menthol Theory." Order at ¶ 137. As with Plaintiffs' Menthol Theory, the challenged representations in each of those cases "involve[s] misleading labels which do not rely on the consumers' interpretation of the label such that the plaintiffs' damages model needs to worry about different categories of harm." *Id.* ¶ 131. Further, Defendants' reliance on *Townsend v. Monster Beverage Corp.*, 303 F.

The district court carefully considered Defendants' arguments and acknowledged that even Defendants agreed that "Dr. Dubé's model will simply assess the entire price premium attributable to the 'additive-free' descriptor," but they argued it would not isolate the premium "attributable to the specific belief underlying the Menthol Theory." Order at ¶ 66. Considering Defendants' argument—which has been rejected in courts across the country—the district court granted class certification on six states under Plaintiffs' Menthol Theory because, unlike the Safer-Cigarette Theory[15], the Menthol Theory is premised on the fact that the "100% additive-free" tobacco representation is literally false and does not depend on alleged varying consumer interpretation. *Id*. at ¶ 137.

Thus, the factual issue presented under the Menthol Theory is binary—the representation either is true or false (*i.e.*, the tobacco is additive-free or it contains an additive). As the district court held:

> The Defendants' effort to argue that the Menthol Theory fails under *Comcast v. Behrend*, because additive-free could stand for a belief that menthol is not an additive and that the cigarettes are free of other, non-menthol additives, goes too far. The Court already has concluded that the additive-free description on Natural American's menthol products

Supp. 3d 1010 (C.D. Cal. 2018), is misplaced, as that ruling hinged on that court's explicit holding that the damages survey in that case "fatally suffers from focalism bias," as evidenced by notably "incongruous results" in the survey. There has been no such finding with Plaintiffs' survey in this matter.

[15] Plaintiffs have filed a Rule 23(f) Petition as to the district court's denial of class certification on the Safer-Cigarette Theory as the district court erred (for different reasons) as detailed in Plaintiffs' Petition.

plausibly misleads a reasonable consumer and notes that menthol is an additive. Thus, to the extent that consumers believed that Natural American menthol cigarettes did not contain additives based on the additive-free label's assertion to that effect, Dr. Dubé's model is designed to calculate the price premium associated with that label.

Order at ¶ 137. (internal citations omitted).

Defendants contest this holding by attempting to recast Plaintiffs' liability theory. Defendants suggest that the real theory is that a reasonable consumer would interpret the "100% additive-free" tobacco representation to mean that the tobacco was free of menthol that specifically migrated to the tobacco and became an additive. Defs.' Pet. at 21. Thus, Defendants argue, that the measure of damages must be the difference between the value of menthol cigarettes with *entirely* additive-free tobacco (*i.e.*, the menthol does not migrate from the filter to the tobacco) and menthol cigarettes that are free of all additives *except* migrated natural menthol. *Id.* (emphasis in the original). This is not Plaintiffs' theory. Rather, Plaintiffs allege that a reasonable consumer would be misled by the "100% additive-free" tobacco representation because it is literally false: the tobacco is not additive-free. The district court did not misunderstand Plaintiffs' Menthol Theory and correctly observed the literal falsity of the "100% additive-free" tobacco representation. *See In re Santa Fe Nat. Tobacco Co.*, 288 F. Supp. 3d at 1234, 1241. Accordingly, the false representation should not have been made at all, and a proper damages model looks at the value of the product with and without that misleading representation.

That is precisely what Plaintiff's expert, Dr. Dubé, will measure using a conjoint analysis.

Ultimately, Defendants argue that any damages model should credit them for not including even *more* additives in tobacco that is already falsely labeled as being 100% additive-free. This argument is absurd. To that end, without citation to authority, Defendants present a hypothetical related to a "fat free" representation with a bold conclusion as to what damages methodology a hypothetical court in an unknown jurisdiction would find is appropriate. The overwhelming body of case law disproves Defendants' uncited hypothetical, and it should be ignored.[16]

Plaintiffs' Menthol Theory of liability fits a conjoint analysis that simply isolates the price premium attributed to the "100% additive-free" representation on every class product, the district court properly granted class certification.

---

[16] *See, e.g. Benson v. Newell Brands, Inc*., No. 19 C 6836, 2021 WL 5321510, at *4-5 (N.D. Ill. Nov. 16, 2021) (finding conjoint analysis by Dr. Dubé (the same expert used by Plaintiffs) fits the theory of liability relating to pacifiers that are represented as "orthodontic" or suitable for use by children who are older than 24 months, but are not, where the damages model "will compute the Price Premium, which involves conducting a marketplace simulation of the oligopoly market in which defendants and their main competitors compete on prices" and calculates the "incremental economic value to Class Members from the benefits they associate with the Challenged Claims on the labels of the Challenged Products." The features of Dr. Dubé's "choice-based conjoint analysis provide 'the necessary consumer demand inputs required to measure economic damages,' and the ability to "predict real marketplace choices."); *see also In re Takata Airbag Prod. Liab. Litig*., --F. Supp. 3d --, No. 15-MD-02599-FAM, 2023 WL 4925368, at *10 (S.D. Fla. June 20, 2023) (accepting Dr. Dubé's conjoint analysis damages method for calculating class-wide damages at class certification).

## <u>CONCLUSION</u>

Because the standard for granting Rule 23(f) relief is not met, the Court should

deny Defendants' petition.

*/s/ Nancy R. Long*
NANCY R. LONG
JONAS M. NAHOUM
**Long, Komer & Associates, P.A.**
P.O. Box 5098
Santa Fe, NM 87502-5098
Phone: (505) 982-8405
Email: nancy@longkomer.com
        jonas@longkomer.com

MELISSA S. WEINER
**Pearson Warshaw, LLP**
328 Barry Avenue S., Suite 200
Wayzata, MN 55391
Phone: (612) 389-0600
Email: mweiner@pwfirm.com

SCOTT P. SCHLESINGER
**Schlesinger Law Offices, P.A**.
1212 SE Third Ave.
Ft. Lauderdale, FL 33316
Phone: (954) 467-8800
Email: scott@schlesingerlaw.com

*Counsel for Plaintiffs-Respondents*

## CERTIFICATE OF WORD COUNT

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I hereby certify that the foregoing Response, Pursuant to Federal Rule of Civil Procedure 23(f) which was prepared using Times New Roman 14-point typeface, contains 4898 words, excluding the parts of the document that are exempted by Rule 32(f) and the Tenth Circuit Rule 32(B). This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word) used to prepare the document.

I declare under penalty of perjury that the foregoing is true and correct.


*/s/Nancy R. Long*
NANCY R. LONG

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 28, 2023, I transmitted the foregoing document to the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit via the court's CM/ECF system.  I further certify that all parties are represented by counsel of record who will be served by the Court's CM/ECF system.

**LONG, KOMER & ASSOCIATES, PA**

*/s/Nancy R. Long*
NANCY R. LONG
nancy@longkomer.com
